**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PNC BANK, NATIONAL
ASSOCIATION and PNC FINANCIAL
SERVICES GROUP, INC.,

        Plaintiffs,

        v.

ONUR HAYTAC,

        Defendant.

Civil Action No. 2:24-cv-01604

**FIRST AMENDED COMPLAINT FOR DECLARATORY JUDGMENT**

Plaintiffs PNC Bank, National Association ("PNC Bank") and PNC Financial Services Group, Inc. ("PNC FSG," and together with PNC Bank referred to herein as "PNC") files this First Amended Complaint against Defendant Onur Haytac ("Mr. Haytac") and in support states as follows:

**NATURE OF THE ACTION**

1.      PNC files this declaratory judgment action to vindicate its contractual rights against Mr. Haytac.

2.      This dispute arises out of Mr. Haytac's employment with PNC pursuant to an Employment Agreement by and between Mr. Haytac and PNC FSG dated June 16, 2022 (the "Employment Agreement").[1]

3.      As alleged more fully below, PNC terminated Mr. Haytac for "Cause" – as that term is defined in the Employment Agreement – because he engaged in a pattern of wrongful

---

[1] While PNC FSG is a signatory to the Employment Agreement, PNC, as that term is defined under that agreement, includes PNC FSG along with its parents, subsidiaries and Affiliates.  PNC Bank is PNC FSG's banking subsidiary and was Mr. Haytac's employing entity.

behavior in which he: (i) attempted to and did circumvent critical PNC risk and compliance processes; (ii) instructed, pressured, or coerced other employees to circumvent PNC's risk and compliance processes and threatened to retaliate against them if they failed to do so; (iii) threatened to retaliate against employees if they reported risk and compliance issues to PNC management; (iv) engaged in a pattern of abhorrent, threatening, and abusive behavior against his staff; and (v) engaged in acts of dishonesty when PNC investigated the above acts.

4.        While PNC lawfully terminated him, Mr. Haytac has accused PNC of breaching the "for Cause" provisions under the Employment Agreement and breaching the purchase agreement between PNC FSG, Linga, Inc. ("Linga"), and Mr. Haytac through which PNC FSG acquired Mr. Haytac's former business, Linga (the "Purchase Agreement").

5.        Despite the evidence supporting Mr. Haytac's lawful termination, he has threatened PNC with litigation.

6.        On September 18, 2024, Mr. Haytac made unfounded claims against PNC including:

(a)        That PNC had no basis to terminate Mr. Haytac for Cause;

(b)        That PNC's lawful termination of Mr. Haytac was a pretext to prevent Mr. Haytac from achieving an earnout pursuant to the Purchase Agreement;

(c)        That PNC fraudulently induced Mr. Haytac to sell Linga to PNC FSG and that PNC's actions are impeding Linga's growth;

(d)        That the Purchase Agreement may be terminated;

(e)        That PNC conducted an "inappropriate and incompetent investigation" of Mr. Haytac's misconduct; and

- 2 -

(f)    That PNC engaged in witness tampering during its investigation.

7.    Mr. Haytac further alleges that because PNC's termination of Mr. Haytac was without Cause, his termination accelerated certain compensation provisions under the Purchase Agreement that must be paid to him by December 9, 2024 and, if such amounts are not paid, he will file suit against PNC.

8.    Mr. Haytac's allegations also impact the restrictive covenant provisions of the Employment Agreement.  He claims that the termination of his employment without cause terminates the Purchase Agreement and excuses him from adhering to these provisions.

9.    This action is necessary and proper under applicable law to determine permissible future conduct and obligations of the parties pursuant to the Employment Agreement and compensation under the Purchase Agreement.  Therefore, PNC seeks a declaration that Mr. Haytac's termination for Cause was lawful under the Employment Agreement and that Mr. Haytac remains bound by the provisions contained in the Employment Agreement and Purchase Agreement moving forward.

## **PARTIES**

10.    Plaintiff PNC FSG is one of the largest diversified financial services institutions in the United States and is incorporated under the laws of the Commonwealth of Pennsylvania and headquartered in Pittsburgh, Pennsylvania.

11.    Plaintiff PNC Bank is a subsidiary of PNC FSG and is a national banking association whose main office, as designated in its articles of association, is in the State of Delaware, and its principal place of business is in the Commonwealth of Pennsylvania.

12.    Defendant Mr. Haytac is an adult who, upon information and belief, resides in Naples, Florida.

## JURISDICTION AND VENUE

13.    The Employment Agreement contains a forum selection clause stating that the Agreement "shall be governed, construed, interpreted and enforced in accordance with its express terms and otherwise in accordance with the substantive laws of the Commonwealth of Pennsylvania, without reference to principles of conflict of laws of that jurisdiction or any other jurisdiction" and that any claim "will be brought exclusively in the Federal court for the Western District of Pennsylvania or in the Court of Common Pleas of Allegheny County, Pennsylvania." *See* Employment Agreement, § 4.9.  Accordingly, this Court has personal jurisdiction over Mr. Haytac.

14.    This Court has subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 2201.

15.    The Court additionally has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a), because this suit is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

16.    Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and the parties have consented to litigate this dispute in this judicial district.

## FACTS

### I.    The Linga, Inc. Acquisition

17.    Linga is a restaurant point-of-sale software interface company founded by Mr. Haytac.

- 4 -

18.     On or about June 16, 2022, PNC FSG entered into the Purchase Agreement with Linga and Mr. Haytac, whereby PNC FSG purchased all outstanding equity interests in Linga from Mr. Haytac (the "Linga Acquisition").

19.     As part of the Linga Acquisition, Mr. Haytac accepted employment with PNC as Linga's President and entered into the Employment Agreement on June 16, 2022.

**(a)     Mr. Haytac's Employment Agreement**

20.     Pursuant to the Employment Agreement, Mr. Haytac agreed to be bound by the following provisions:

> I.     [Mr. Haytac] agrees that, at any time during [Mr. Haytac]'s employment with PNC, including during any notice period, and during the two-year period following [Mr. Haytac]'s date of termination for any reason, whether during the Employment Period or on or after expiration of the Employment Period (the "Restricted Period"), [Mr. Haytac] shall not, directly or indirectly, own, manage, operate, control, be employed by or provide services to (whether as an employee, consultant, independent contractor or otherwise, and whether or not for compensation) any Person (other than PNC) that is or will be engaged in a Competitive Business anywhere in the world; provided, however, that nothing herein shall prohibit [Mr. Haytac], considered together with his Affiliates, from being a passive owner of not more than 4.9% of the outstanding equity interests in any entity whose securities are listed and traded on a nationally recognized securities exchange or any other entity, so long as [Mr. Haytac] has no active participation in the business or management of such entity.  Employment Agreement, § 3.2.

> II.     During the Restricted Period, [Mr. Haytac] shall not, directly or indirectly, either for [Mr. Haytac]'s own benefit or purpose or for the benefit or purpose of any person or entity other than PNC, solicit, call on, do business with, or actively interfere with PNC's relationship with, or attempt to divert or entice away, any person or entity that [Mr. Haytac] should reasonably know is (a) a customer for which Linga provides any services as of [Mr. Haytac]'s termination date, (b) was a customer of Linga for which Linga provided any services at any time during the twelve (12) months preceding [Mr. Haytac]'s termination date, or (c) was, as of [Mr. Haytac]'s termination date, considering retention of Linga to provide any services but only to the extent of services then being

provided by Linga (and not other unrelated services that might be provided to such person or entity by PNC). For purposes of this Section 3.3, "solicit" means accepting business from, or initiating or having any contact or communication of any kind whatsoever, whether directly or indirectly, for the express or implicit purpose of inviting, encouraging or requesting a customer to: (i) transfer to [Mr. Haytac] any account at [Mr. Haytac]'s new employer, including [Mr. Haytac] if [Mr. Haytac] is self-employed; (ii) open any new account with [Mr. Haytac] or [Mr. Haytac]'s new employer; (iii) transact any business with [Mr. Haytac] or [Mr. Haytac]'s new employer; or (iv) otherwise discontinue said customer's business relationship with PNC. [Mr. Haytac] expressly and specifically acknowledges and agrees that the term "solicit" as used in this Section 3.3 includes, but is not limited to, any mailing or other communication that is sent directly to one or more persons or entities described in this Section 3.3.  *Id.* at § 3.3.

III.    During the Restricted Period, [Mr. Haytac] shall not, directly or indirectly, either for [Mr. Haytac]'s own benefit or purpose or for the benefit or purpose of any person or entity other than PNC, employ or offer to employ, call on, or actively interfere with PNC's relationship with, or attempt to divert or entice away, any employee of PNC (or individual who was an employee of PNC during the six (6) months prior to such solicitation, contact or offer), nor shall [Mr. Haytac] assist any other person or entity in such activities.  *Id.* at § 3.4.

IV.    During [Mr. Haytac]'s employment with PNC, and thereafter regardless of the reason for termination of such employment, [Mr. Haytac] will not disclose or use in any way any Confidential Information acquired in the course of his employment with PNC, all of which is the exclusive and valuable property of PNC whether or not conceived of or prepared by [Mr. Haytac], other than (a) information generally known in PNC's industry or acquired from public sources, (b) as required in the course of employment by PNC, (c) as required by any court, supervisory authority, administrative agency or applicable law, or (d) with the prior written consent of PNC. Upon termination of [Mr. Haytac]'s employment for any reason, [Mr. Haytac] expressly and specifically agrees to return to PNC any and all confidential information acquired in the course of his employment, in whatever form it may exist.  *Id.* at § 3.5.[2]

---

[2] The Purchase Agreement contains similar restrictive covenants. Purchase Agreement, § 5.9.

21.     Under Section 1.7(c) of the Employment Agreement, PNC may terminate the Employment Agreement "at the option of [PNC] for Cause."

22.     "Cause" is defined under Section 4.1.1 of the Employment Agreement to include:

a.  intentional disregard of and failure to follow the reasonable directives of [Haytac's PNC supervisor] or any material breach of this Agreement;

b.  gross negligence or willful misconduct in the performance of [Mr. Haytac's] duties to PNC;

c.  breach of any fiduciary duty owed to PNC;

d.  any act of fraud, misappropriation, dishonesty, or embezzlement against PNC or any client or customer of PNC;

e.  breach of any material policy of PNC, referred to in the Code of Business Conduct and Ethics or the Ethics and Conduct Policy, each as in effect from time to time; or

f.  entry of any formal order against [Mr. Haytac] by a regulatory body, finding a violation of any law or regulation as a result of or due to [Mr. Haytac's] action or inaction with regard to matters over which [Mr. Haytac] had purview and control to remedy but failed to do so, or any plea of guilty or nolo contendere [Mr. Haytac] to any such charges lodged against [Mr. Haytac].

*Id.* at § 4.1.1(a)-(f).

23.     If the circumstances giving rise to Cause are not susceptible to a cure by Mr. Haytac, the Employment Agreement provides PNC with the right to terminate for Cause without providing Mr. Haytac with a cure period.  As alleged below, Mr. Haytac's misconduct was not susceptible to cure.

**(b)     Mr. Haytac's Purchase Agreement Compensation Structure**

24.     The Linga Acquisition allowed Mr. Haytac to be compensated in two ways: (i) an initial payment made at the time of the closing; and (ii) additional compensation based on: (a) completing certain modules/product lines to be developed by Linga; and (b) achieving certain cumulative revenue targets.

25.     Specifically, there are four modules/product lines that were set as goals for Linga to develop, and the successful development of each one of these modules/product lines would result in additional compensation to Mr. Haytac.

26.     There was also tiered revenue targets that, if Linga achieved, would result in additional compensation to Mr. Haytac.

27.     Following the Linga Acquisition, Linga continued to operate as a point-of-sale software interface as a subsidiary of PNC, subject to PNC's oversight and compliance processes.

28.     The Linga Acquisition closed on or about September 23, 2022.

**II.     Mr. Haytac's Employment with PNC and Linga's Operations**

29.     As Linga's President, Mr. Haytac was responsible for the overall operations of Linga.

30.     In this role, Mr. Haytac managed a team of Linga employees to sell Linga's products, develop software product lines, as well as develop relationships with third parties to integrate with Linga's technology.

31.     As a PNC subsidiary, PNC required Linga to strictly follow PNC's risk and compliance processes at all times.

32.     PNC's risk and compliance processes are essential to PNC's operation in compliance with applicable laws and regulations while protecting PNC's customers, business, and employees.

33.     PNC made Mr. Haytac aware of Linga's obligations to comply and, indeed, Mr. Haytac agreed to comply with PNC's policies, including PNC's Code of Business Conduct and Ethics, pursuant to the Employment Agreement: "[Mr. Haytac] shall be subject to all policies of PNC as in effect from time to time, including without limitation, the Code of Conduct." *See* Employment Agreement, § 1.2.

34.     Mr. Haytac also agreed to "read the PNC Code of Business Conduct and Ethics and related ethics policies . . . and to comply with the policies contained in them" by executing the Code of Business Conduct and Ethics Certification Acknowledgement.

35.     Despite being aware that PNC required Linga to adhere to PNC's risk and compliance processes in its the day-to-day operations, following the Linga Acquisition Mr. Haytac operated Linga in a fashion that violated PNC's risk and compliance processes.

**(a)     Enterprise Third Party Management Process**

36.     One of Mr. Haytac's most egregious violations of PNC's risk and compliance processes was his blatant disregard of PNC's Enterprise Third Party Management ("ETPM") process.

37.     The ETPM process is a critical component of PNC's operations in the heavily regulated financial industry and protects PNC and PNC's customers by ensuring that any new relationship with a third party has been vetted and approved by PNC.

38.     As Mr. Haytac was aware, PNC's or its subsidiaries' use of third parties creates potential risk to PNC and its customers, most significantly in cyber security, compliance, and reputational risk.

39.     Moreover, PNC is subject to regulation by multiple federal regulatory bodies including the Board of Governors of the Federal Reserve System, the Federal Deposit Insurance Corporation, the Consumer Financial Protection Bureau, the Office of the Comptroller of the Currency, and the U.S. Department of the Treasury that set minimum control standards that financial institutions are required to follow when engaging vendors or other third parties.

40.     The ETPM process is designed to identify, manage, and mitigate potential risks of conducting business with third parties.

41.     This ensures that PNC is abiding by applicable federal laws and regulations in its business dealings while minimizing risk to PNC and its customers.

42.     The ETPM process involves several steps, including pre-contract assessments and post-contract monitoring, and PNC mandates comprehensive training and resources so that employees are adequately educated and supported to engage with the ETPM process.

43.     Despite knowing the ETPM process was a vital component of PNC's risk and compliance policies, Mr. Haytac circumvented the ETPM process to enter contracts and relationships with unapproved vendors and third parties.

44.     Specifically, when Linga employees informed Mr. Haytac that third-party vendors like ADP were not cleared by the ETPM process to be integrated into Linga's "Payroll Marketplace" product, he began pressuring Linga employees to ignore the ETPM process.

45.     Linga had developed the software necessary to allow its customers to use Payroll Marketplace, but many of the third-party payroll providers this product sought to integrate with, such as Shogo, Paychex, and ADP, had not been approved to do so through the ETPM process.

46.     Linga employees – who are also subject to the Code of Business Conduct and Ethics, and who were aware the payroll providers offered in the Payroll Marketplace had not received ETPM approval – were understandably uncomfortable providing non-approved third-party vendor integrations in Linga's Payroll Marketplace product to customers.

47.     When those employees pushed back on selling the Payroll Marketplace as integrated with those unapproved third-party payroll providers to customers without ETPM approval, Mr. Haytac pressured his employees to "think outside the box" regarding prospective vendors and third parties.  Linga employees reported that they understood this to mean outside of PNC's ETPM process and PNC's other compliance policies.

48.    In an email on August 9, 2024, Mr. Haytac wrote "… I also have some ideas to get around some of the PnC [*sic*] limitations," which his employees reported included the ETPM process, and scheduled an in-person meeting for Linga's leadership team on August 14, 2024.

49.    This was unusual and represented the first in-person meeting of Linga's leadership team in nearly two years.

50.    Linga employees reported that they believed Mr. Haytac's message and call for a meeting was a direct response to the concerns they raised about selling unapproved integrations of vendors through the Payroll Marketplace.

51.    Indeed, at the August 14, 2024 meeting, Mr. Haytac berated Linga's employees for "thinking like bankers," and threatened anyone that continued to refuse his instructions to ignore PNC's risk and compliance processes with the loss of their annual bonus or their jobs.

52.    After the August 14, 2024, meeting, Mr. Haytac emailed explicit instructions to his staff to begin selling integrations of unapproved vendors through Payroll Marketplace, stating: "Any integration we have had from day one, shogo, paycheck, adp, all the others we will not hold the clients to integrate. Make sure you keep the clients by moving fast."

53.    Because following Mr. Haytac's instructions would violate PNC's Code of Business Conduct and Ethics and subject them to potential disciplinary action, Linga employees escalated their concerns to PNC management.

54.    Through Mr. Haytac's actions circumventing the ETPM process, Linga engaged numerous vendors without obtaining approval from PNC, including but not limited to: Shogo, ADP, Paychex, Restaurant365, Qlub, and Deliverect.

55.    When confronted about his violation of the ETMP process, Mr. Haytac denied that he was ignoring the ETPM process.

56.    When shown evidence of his violation of the policy, Mr. Haytac complained that PNC's risk and compliance programs were "killing" Linga's business.

57.    PNC is still learning the complete extent to which Mr. Haytac obfuscated and avoided the ETPM process.

58.    For example, PNC has learned of an additional relationship that Linga entered at Mr. Haytac's behest without ETPM approval where Mr. Haytac instructed employees to circumvent the ETPM process for a vendor who had a history of financial fraud because of Mr. Haytac's personal friendship with the vendor.

59.    Moreover, following Mr. Haytac's departure, Linga has uncovered other situations where Mr. Haytac, individually or through LLC's undisclosed to PNC, was the only authorized individual or administrator for accounts that Linga has with third party vendors.

**(b)    Mr. Haytac's Misrepresentations**

60.    Apart from the ETPM process, PNC learned that Mr. Haytac also operated Linga in other ways that were not compliant with PNC's risk and compliance processes.

61.    For example, Mr. Haytac misrepresented facts and information when prompted to explain certain aspects of Linga's operations, such as the nature of Linga's international relationships with third parties.

62.    Upon information and belief, Mr. Haytac directed, or with knowledge, permitted his direct reports to misrepresent to PNC the nature of Linga's international sales and operations.

63.    These misrepresentations created compliance risk because PNC is required to ensure that any foreign third parties are in compliance with applicable financial regulations.

64.    Despite this, Linga was entering international contracts and relationships before PNC had time to evaluate the contracts for potential risks to customers and PNC.

- 12 -

65.     When questioned about these actions, Mr. Haytac erroneously claimed he was not operating Linga outside the bounds of PNC's risk and compliance processes.

**(c)     Mr. Haytac's Abuse of Linga Employees**

66.     A Linga Information Technology employee identified suspicious lines of computer code entered in Linga's software by one of Linga's outside vendors.

67.     Pursuant to PNC risk policy, the employee filed a report to elevate his concern to the appropriate parties and ensure the matter was investigated.

68.     When Mr. Haytac learned of the report, he chastised the employee, informing the employee that Linga could not let PNC "get in the way of [Linga hitting] our goals" and did not believe any report should have been filed.

69.     Beyond specific incidents, Mr. Haytac also acted unprofessionally in his day-to-day interactions with employees, such as telling an employee he would be "pounding on your [expletive] like Hurricane Ian"; calling employees "cockroaches" for failing to meet his expectations; and threatening to "fire everyone" for "acting like bankers."

70.     Mr. Haytac's actions created an environment of fear and suspicion among Linga's employees.

**III.     Mr. Haytac's Termination**

71.     Mr. Haytac's circumvention of the ETPM process, directives to Linga employees to do the same, and other actions described above prompted Linga employees to escalate the matter to PNC's Ethics department for review.

72.     After receiving information about Mr. Haytac's actions regarding the ETPM violation, abuse of Linga's employees, and threats of retaliation, PNC conducted an internal investigation.

73.    Following this investigation, PNC determined that Mr. Haytac repeatedly violated the Employment Agreement.

74.    The Employment Agreement provides that: "[Mr. Haytac] shall be subject to all policies of PNC as in effect from time to time, including without limitation, the [PNC Code of [Business] Conduct [and Ethics]." *See* Employment Agreement, § 1.2.

75.    Mr. Haytac's actions violated PNC's ETPM policy and Code of Business Conduct and Ethics and, in turn, violated the Employment Agreement.

76.    For instance, Mr. Haytac's directive to his employees to ignore the ETPM process violated the Employment Agreement because it is a material and incurable violation of PNC's Code of Business Conduct and Ethics, which prohibited him from "ask[ing] an employee or anyone acting on behalf of PNC to do something that would be prohibited by this Code." *See* PNC's Code of Business Conduct and Ethics, 5.

77.    Mr. Haytac's admonishments and threats to employees who raised questions or issues related to the ETPM policy violated PNC's Code of Business Conduct and Ethics because it required Mr. Haytac to create "an environment where employees feel comfortable asking questions about, and reporting potential violations of, this Code and PNC policies." *Id.* at 6.

78.    Mr. Haytac's general treatment of his employees through name calling and threats likewise violated the Code of Business Conduct and Ethics to "[a]lways act in a professional, honest, and ethical manner when conducting your activities with and on behalf of PNC." *Id.* at 5.

79.    Mr. Haytac also attempted to deceive PNC during its investigation into his actions. When asked about his actions (e.g. instructing employees to circumvent the ETPM process, directing or permitting his direct reports to misrepresent to PNC the extent of Linga's

international sales and operations, and retaliation or threats to employees), Mr. Haytac was evasive, non-responsive, untruthful, and misleading in his responses.

80.     This behavior constitutes additional violations of PNC policies, including the Code of Business Conduct and Ethics, which states that he was required to "[c]ooperate and provide honest and accurate information in investigations, regulatory examinations, audits, and similar types of inquiries." *Id.*

81.     The above actions were incurable violations of PNC's Code of Business Conduct and Ethics, willful misconduct in the performance of his duties, and dishonesty, constituting Cause for termination under Section 4.1.1 of the Employment Agreement.

82.     Accordingly, following the internal investigation, PNC terminated Mr. Haytac for Cause on September 9, 2024.

## FIRST CAUSE OF ACTION
### (Declaratory Judgment Under 28 USC §2201)

83.     PNC incorporates all allegations in the foregoing paragraphs by reference as if set forth fully herein.

84.     A dispute exists between PNC and Mr. Haytac regarding Mr. Haytac's lawful termination, and both parties' post-termination obligations to each other.

85.     PNC seeks a declaration from the Court that PNC's termination of Mr. Haytac was lawful and warranted under the Employment Agreement and that Mr. Haytac is bound by the provisions contained in the Employment Agreement and Purchase Agreement moving forward.

## PRAYER FOR RELIEF

WHEREFORE, PNC requests judgment against Mr. Haytac and in favor of Plaintiffs for:

(i)     A declaration pursuant to 28 U.S.C. § 2201 that Mr. Haytac was terminated for Cause by PNC pursuant to the Employment Agreement § 1.2 for violation of the Employment Agreement and PNC's Code of Business Conduct and Ethics;

(ii)    A declaration that Mr. Haytac must adhere to all post-employment obligations as specified in the Employment Agreement and Purchase Agreement;

(iii)   All costs in prosecuting this litigation; and

(iv)    Any additional relief, legal or equitable, general or special, to which Plaintiffs may be justly or equitably entitled.

Dated: November 25, 2024                    Respectfully submitted,


**REED SMITH LLP**


*/s/ Perry A. Napolitano*
Perry A. Napolitano
PA I.D. No. 56789
PNapolitano@ReedSmith.com
Catherine S. Ryan
PA I.D. No. 78603
CRyan@ReedSmith.com
Christopher S. Bouriat
PA I.D. No. 324004
CBouriat@reedsmith.com
Robert J. Tritschler
PA I.D. No. 329150
Rtritschler@reedsmith.com
225 Fifth Avenue
Pittsburgh, PA 15222
(412) 288-3131

*Counsel for Plaintiffs*
*PNC Bank, National Association and PNC*
*Financial Services Group, Inc.*

- 16 -